**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

SHANNON POTTS,

                **Plaintiff,**

      v.                                               **3:19-cv-01403**

BLYDEN POTTS,

                **Defendant.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

**DECISION and ORDER**

## I.    INTRODUCTION

Plaintiff Shannon Potts ("Plaintiff"), a Fire Lieutenant with the City of Binghamton Fire Department ("Fire Department"), commenced this diversity action against Defendant Blyden Potts ("Defendant"), Plaintiff's brother.  Plaintiff alleges that on November 14, 2018, Defendant sent a defamatory email to the Chief of the Fire Department that "caused the City of Binghamton to suspend Plaintiff from his employment duties from December 27, 2018 through July 30, 2019, without pay." 2nd Am. Compl. ("SAC"), Dkt. No. 44, ¶ 28; _see id._ ¶ 48 ("As a direct and proximate result of the Defendant's November 14, 2018 email to Plaintiff's employer, Plaintiff was suspended from active duty without pay from December 27, 2018 until July 30, 2019 . . . .").  Plaintiff also alleges that Defendant's November 14, 2018 email caused him to undergo "a series of psychological examinations and consultations with various City of Binghamton personnel and a mental health

1

professional," *id.* ¶ 48, to be stripped of his firearms and firearms permit, *id.* ¶ 49, to suffer the loss of employment income, fringe benefits, and career advancement opportunities, to incur expenses to recover his firearms permit, and to suffer "personal and bodily injuries arising from or exacerbated by the stress of having to fight to keep his job and recover his firearms." *Id.* ¶ 50; *see id.* ¶ 43;[1] *id.* ¶ 60 ("As a direct and proximate result of the Nov. 14, 2018 email sent by Defendant to Plaintiff's employer, Plaintiff has suffered personal injuries and bodily injuries arising from the additional stress caused by the prospect of losing his job, and the reality of having lost all future career advancement potential within the City of Binghamton Fire Department.").

The SAC asserts three causes of action – tortious interference with contractual relations, defamation, and intentional infliction of emotional distress. *See generally id.* Defendant moves pursuant to Rules 12(b)(1) & (6) of the Federal Rules of Civil Procedure to dismiss the SAC. Dkt. No. 60. He argues, *inter alia*, that the action must be dismissed "because the intentional infliction of emotional distress and interference with contractual relations claims are entirely duplicative of Plaintiff's defamation claim and Plaintiff cannot possibly establish sufficient damages to invoke this Court's diversity jurisdiction pursuant

---

[1]Plaintiff asserts:

43. Defendant's November 14, 2018 email was a direct and proximate cause of: a significant change in Plaintiff's career trajectory within the City of Binghamton Fire Department, Plaintiff's loss of current overtime earnings, Plaintiff's loss of accumulated sick time, Plaintiff's loss of his employment with the City of Binghamton if he is medically required to take sick leave which he no longer has available, Plaintiff's loss of all or part of his pension if he loses his job due to the need for medical care for which he no longer has sick leave, Plaintiff's loss of increased future earnings, Plaintiff's loss of future increased pension payments calculated based upon current and future earnings; Plaintiff's loss of opportunity for promotions and career advancement with his employer, and Plaintiff's legal fees incurred for the reinstatement of his firearms license and return of his firearms.

SAC ¶ 43.

to 28 USC § 1332 with respect to his remaining defamation claim." Dkt. No. 60-6, at 1. Defendant maintains that the complained-of actions taken by the Fire Department were the exclusive results of Plaintiff's conduct on December 23, 2018 when he got into an argument with a subordinate firefighter and later made a statement that several firefighters interpreted as a threat to shoot the subordinate firefighter. *Id.* at 2. Plaintiff opposes the motion, Dkt. No. 68, and Defendant files a reply. Dkt. No. 69.

## II.   DISCUSSION

"When presented with motions under both Federal Rule of Civil Procedure 12(b)(1) to dismiss for lack of subject matter jurisdiction and Federal Rule of Civil Procedure 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted, the first issue is whether the Court has the subject matter jurisdiction necessary to consider the merits of the action." *Morrell v. WW Int'l, Inc.*, No. 20-CV-9912 (JGK), 2021 WL 3185608, at *2–3 (S.D.N.Y. July 27, 2021)(citing *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990); *Abrahams v. App. Div. of the Sup. Ct.*, 473 F. Supp. 2d 550, 554 (S.D.N.Y. 2007), *aff'd on other grounds*, 311 F. App'x 474 (2d Cir. 2009); *SEC v. Rorech*, 673 F. Supp. 2d 217, 220–21 (S.D.N.Y. 2009)).

### a.   Rule 12(b)(1) - Lack of Subject Matter Jurisdiction

Plaintiff invokes the Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). SAC ¶ 3. This confers original jurisdiction on the federal district courts with respect to "all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between ... citizens of different States." 28 U.S.C. § 1332(a). Defendant argues that diversity jurisdiction is lacking because the damages of

3

which Plaintiff complains were of his own making and not caused by Defendant's conduct. Thus, Defendant contends, Plaintiff fails to adequately allege that the amount in controversy exceeds $75,000.

### Standard of Review

"To prevail against a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of proving the Court's jurisdiction by a preponderance of the evidence." *Morrell v. WW Int'l, Inc.*, No. 20-CV-9912 (JGK), 2021 WL 3185608, at *2 (S.D.N.Y. July 27, 2021)(citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). "In considering such a motion, the Court generally must accept the material factual allegations in the complaint as true." *Id.* (citing *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004)).  The Court does not, however, draw all reasonable inferences in the plaintiff's favor. *Id.* (citing *J.S. ex rel. N.S.*, 386 F.3d at 110 and *Graubart v. Jazz Images, Inc.*, No. 02-cv-4645, 2006 WL 1140724, at *2 (S.D.N.Y. Apr. 27, 2006)).

"Although a plaintiff invoking federal jurisdiction must demonstrate a reasonable probability that the amount-in-controversy requirement is satisfied, [courts] recognize a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 223 (2d Cir. 2017)(internal quotation marks and citations omitted); *see Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003)(Plaintiff's burden of demonstrating to a reasonable probability that the $75,000 threshold has been satisfied "is hardly onerous," because courts "recognize 'a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy.'")(quoting

4

*Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir. 1999)).  "A defendant may rebut that presumption by demonstrating 'to a legal certainty that the plaintiff could not recover the amount alleged or that the damages alleged were feigned to satisfy jurisdictional minimums.'" *Pyskaty*, 856 F.3d at 223 (quoting *Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006)(citation and brackets omitted) and citing *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S. Ct. 586, 82 L.Ed. 845 (1938) ("It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal."); *see I. Constr. Mgmt., LLC v. M. Melnick & Co. Inc.*, No. 20 CIV. 9188 (JPC), 2021 WL 1092354, at *2 (S.D.N.Y. Mar. 22, 2021) ("To rebut this presumption, a defendant must demonstrate 'that the complaint was so patently deficient as to reflect to a legal certainty that [the plaintiff] could not recover the amount alleged or that the damages alleged were feigned to satisfy jurisdictional minimums.'")(quoting *Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006)(interior quotation marks and citations omitted)).  "The Second Circuit has set a high bar for overcoming the presumption: 'the legal impossibility of recovery must be so certain as virtually to negate the plaintiff's good faith in asserting the claim.'" *I. Constr. Mgmt.*, 2021 WL 1092354, at *2 (quoting *Scherer*, 347 F.3d at 397 (alteration omitted))(interior quotation marks and citations omitted).

"[W]here jurisdictional facts are disputed, the Court has the power and the obligation to consider matters outside the pleadings, such as affidavits, documents, and testimony, to determine whether jurisdiction exists." *Morrell*, 2021 WL 3185608, at *2 (citing *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) and *Kamen v. Am. Tel. & Tel.*

*Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)); *see Jarvis v. Cuomo*, No. 5:14-CV-1459 (LEK/TWD, 2016 WL 278934, at *2 (N.D.N.Y. Jan. 21, 2016), *aff'd*, 660 F. App'x 72 (2d Cir. 2016)("When resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court may refer to evidence outside the pleadings without converting the motion into a motion for summary judgment.")(citing *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)); *Gasery v. Kalakuta Sunrise*, LLC, 422 F. Supp. 3d 807, 818 (S.D.N.Y. 2019)("Defendants are not limited to the pleadings in overcoming this presumption, and a court 'may look outside the pleadings to other evidence on the record.'")(quoting *United Food & Commercial Workers Union Local 919, AFL-CIO v. Centermark Props. Meriden Square Inc.*, 30 F.3d 298, 305 (2d Cir. 1994)).  Although the court may "consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue," it "may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004) (citations omitted).  Where jurisdictional facts are placed in dispute, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)(quoting *Makarova*, 201 F.3d at 113).

### Allegations in the SAC

The SAC alleges that on November 14, 2018, Defendant sent an allegedly defamatory email ("November Email") to the Chief of the Fire Department, Daniel Eggleston ("Chief Eggleston"), regarding Plaintiff in the hope that Plaintiff would be terminated from his employment.  SAC at ¶ 18 & Ex. A.  The November Email concerns a

dispute Plaintiff and Defendant were having regarding caring for their mother.  *See* SAC

Ex. A.  It starts with the statement: "I am writing to you again to advise you that my

brother, Shannon Potts, who is an employee of [sic] City of Binghamton Fire Department,

is sociopathic and a liability to you." *Id.*  It then proceeds to recount some of what

Defendant purportedly indicated in a previous email, stating that Plaintiff was calling him

daily with harassing telephone messages, that Plaintiff kept and refused to return their

mother's personal property, "how he tried to kidnap her back to NY," and that Plaintiff

picketed and had a "hunger strike" in front of Defendant's house while stating to their

mother that Plaintiff "was going to die shortly on [Defendant's] front lawn and how she

would be responsible for his death." *Id.*  The email indicates that after the parties' mother

moved in with Plaintiff, he engaged in "fraudulent and grossly unethical" behavior by taking

their mother to an attorney to execute a new power of attorney naming Plaintiff and revoke

a prior power of attorney naming the sister even though Plaintiff previously testified in

court that their mother "is incapacitated from contracting or signing legal documents on her

own behalf;" and that Plaintiff refused to allow their mother to use his phone "to be able to

communicate with anyone else, and [Plaintiff] refuses to allow anyone else to

communicate, effectively socially isolating my mother, which is a form of elder abuse

under NYS elder law." *Id.*

The November Email also recounts a situation that purportedly occurred on

November 14, 2018.  *Id.*  According to the email, at the time the parties' mother was

residing with Plaintiff and, that morning, had called the parties' sister, Courtney, and asked

Courtney to come immediately and take her out of Plaintiff's home. *Id.*  The email

indicates that later that same day, the parties' brother, Tim, reported to Defendant that their mother had also called him asking him to remove her from Plaintiff's home. *Id.* The email indicates that Defendant and Courtney went to Binghamton to try to locate their mother. *Id.* They eventually found her with Plaintiff at a hair salon. *Id.* When Courtney responded affirmatively to Plaintiff's question whether she was bringing a guardianship proceeding "against mom," Plaintiff demanded that Defendant and Courtney leave the hair salon and advised their mother not to talk to Courtney. *Id.* When Defendant and Courtney told Plaintiff that his "power of attorney was fraudulent and had no validity," Plaintiff "called the cops, and proceeded to try to instigate a physical altercation with us, baiting us to assault him. When Courtney touched him lightly he accused her of having assaulted him!"

*Id.* Defendant asserts in the email:

> I believe [Plaintiff] has a mental illness. He has no ethical scruples whatsoever. He lies. He's stolen property from our mother. He's now engaged in fraud. He's accused me of attempted arson - when I hadn't even VISITED the premises that he claimed I wished to burn down! He has no regard for the interests of other people. He seems to be sociopathic, pursuing his own self-interests and treating everyone else as a disposable object that is either of use to him, or a barrier. In short he's a nut, and by his own admission a vindictive one. I think it is only a matter of time before he snaps and goes on a violent rampage.

*Id.*

The SAC also alleges that Plaintiff sent two other allegedly defamatory emails regarding Plaintiff, one on January 10, 2018 to Chief Eggleston ("January Email"), and one in September 2018 to the City of Binghamton Legal Department ("September Email")

(collectively "Prior Emails").  *Id.* at ¶¶ 7, 9-12.[2]  However, Plaintiff alleges that given his "exemplary work performance at the Binghamton City Fire Department since 2003," the Fire Department ignored the Prior Emails. *Id.* at ¶¶ 8, 13.  Thus, even if the Prior Emails were defamatory, Plaintiff appears to have suffered no direct damages from them.

In addition, the SAC asserts that "[b]etween August 27, 2019 and November 2 of 2019, Defendant sent at least 2 additional emails containing false, defamatory and inflammatory statements about Plaintiff to the Broome County Supreme Court Judge presiding over the Article 81 proceeding of Defendant and Plaintiff's mother, as well as to the Judge's staff, and all other parties."  *Id.* ¶ 19.  The SAC does not indicate the content of the statements in these emails or what negative consequences, if any, Plaintiff suffered from them.  Thus, the SAC does not plausibly allege a defamation claim based upon these emails, or damages flowing from them. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)(stating that a court is "not bound to accept as true a legal conclusion couched as a factual allegation"); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements ... are not entitled to the assumption of truth."); *Iqbal*, 556 U.S. at  678 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.")(quoting *Twombly*, 550 U.S. at  570).

In connection with the tortious interference with contractual relations claim, Plaintiff

_____

[2]Although Plaintiff asserts that the Prior Emails were "defamatory and inflammatory" and contained "false and defamatory statements about Plaintiff," SAC ¶¶ 7, 12, he does not attach these emails or provide any allegation as to what statements were actually contained in them. Thus, he fails to assert facts that would plausibly establish that these prior emails were defamatory, as required by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Plaintiff's reliance on the *Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957) pleading standard, *see* Dkt. No. 68, at 8, is misplaced as *Conley* and its progeny have been abrogated by *Twombly*.

seeks "compensatory damages, economic damages, special damages, and punitive damages, in an amount of at least $3,244,547.00." SAC at CM/ECF p. 7.  In connection with the defamation claim, Plaintiff seeks "a. compensatory damages and punitive damages for defamation *per se*, b. compensatory damages, economic damages, and special damages for all losses caused by Defendant's November 14, 2018 email, in an amount of at least $3,244.547.00, c. compensatory damages for all personal injuries and bodily injuries caused and/or exacerbated by Defendant's November 14, 2018 email, [and] d. reimbursement for all attorney fees and costs incurred in retaining Plaintiff's employment, recovering Plaintiff's firearms, and reinstating Plaintiff's firearms permit." SAC at CM/ECF p. 11.  In connection with the  intentional infliction of emotional distress claim, Plaintiff seeks "a. compensatory damages and punitive damages for the severe emotional distress caused by Defendant's malicious and/or reckless actions, b. compensatory damages for all personal injuries and bodily injuries caused and/or exacerbated by the additional stress caused by Defendant's November 14, 2018 email, [and] c. reimbursement for all attorney fees and costs incurred in reinstating Plaintiff's employment, recovering Plaintiff's firearms, and reinstating Plaintiff's firearms permit." *Id.* at CM/ECF pp. 12-13.

### Plaintiff's Conduct on December 23, 2018

Defendant asserts that documentary evidence obtained through a Freedom of Information Law ("FOIL") Request to the City of Binghamton (the "City") reveals that just four days before his suspension from the Fire Department on December 27, 2018, Plaintiff launched into a verbal tirade at the firehouse during which he made statements that were

10

interpreted and reported to Chief Eggleston by Plaintiff's colleagues as a threat to shoot one of his co-workers (the "December 23 Incident"). Dkt. 60-6, at 5 (citing Rubin Affirmation at ¶¶ 3-5 and Exs. "A" (Response to FOIL Request) & "B" (FOIL Record)).  As Defendant argues, the details of the December 23 Incident are contained within a series of documents submitted by Plaintiff and the City of Binghamton as part of and/or in response to a Verified Complaint filed by Plaintiff with the New York State Division of Human Rights ("DHR") accusing the City of Binghamton and the Fire Department's Director of Personnel and Safety, Patricia Keppler, of "unlawful discriminatory and retaliatory practices" including violations of the New York State Human Rights Law ("HRL") and the Americans with Disabilities Act ("ADA"). *See generally* DHR R. 001-022.[3]  In sum and substance, the DHR Complaint alleges that Plaintiff's December 27, 2018 suspension and loss of his firearms permit was the direct result of ongoing discrimination and retaliation by the City and Keppler (collectively "DHR. Respondents") on the basis of Plaintiff's prior military service and "perceived mental health and physical disabilities" dating back to 2015. *See id.*

In response to the DHR Complaint, the DHR Respondents submitted numerous exhibits, including the original inter office memos from Plaintiff's co-workers regarding the December 23 Incident, transcripts of conversations with Plaintiff, police reports and court documents related to the suspension of Plaintiff's firearms permit, reports of psychological evaluations that occurred as a result of the December 23 Incident, an Agreement in Lieu of Discipline executed by Plaintiff as a result of the December 23 Incident and other correspondence and documents.  *See generally* DHR R. 084-322.  Defendant argues that

---

[3]In citing to the DHR Record provided by Defendant, the Court cites to the Bates Stamped number on the document. These DHR Records are contained at Dkt. Nos. 60-3, 60-4, and 60-5.

this record conclusively establishes that Plaintiff was the sole, proximate and superseding cause of his own suspension, the loss of his firearms permit, and each and every one of the categories and items of damages he now seeks to recover from Defendant.  Dkt. No. 60-6 at 6.

The DHR Record reveals that on December 23, 2018, Plaintiff returned to the firehouse from personal leave. DHR R. 012.  Plaintiff asserts in his memorandum of law that "[t]he reality is that Plaintiff had the good judgment to take a leave of absence to deal with stressful family matters at the end of November, 2018."  Dkt. No. 68, at 3.  The Court presumes that this leave of absence ran from November 14, 2018 until Plaintiff returned to work on December 23, 2018.  *See* DHR R. at 12 ("On December  23, 2018, Mr. Potts returned to work after haven taken leave that was made necessary by a very difficult family situation involving his mother, who was the subject of an Article 81 guardianship proceeding.").  Shortly after his arrival at work on December 23, 2018, Plaintiff had a conversation with fellow firefighter Marco Michitti. *Id.*  Plaintiff states in his verified DHR Complaint that "Mr. Michitti 'greeted' Mr. Potts by asking: 'Hey Shannon, how was your hunger strike?'" *Id.; see id.* 94.[4]  Plaintiff considered Michitti's statements "to be disrespectful and insubordinate." *Id.* at 12.  Plaintiff asserts in the DHR Complaint that in January 2018, his brother "began sending disparaging emails about [him] to the current

---

[4]According to Officer Michitti, he stated to Plaintiff: "Hey, how did you make out with that hunger strike?" DHR R. at 94.  Plaintiff purportedly responded with "What hunger strike?"  *Id.*  Officer Michitti responded with "Oh, there was more than one?" *Id.*  Plaintiff purportedly replied "No, there was just the one about a year ago." *Id.*  Officer Michitti then stated: "Oh, sorry, I heard you just had one recently and wanted to know how you made out." *Id.*

The Court does not cite these, or any other, hearsay statements for the truth of the matter asserted but only to give context as to the issues raised in this case.

Fire Chief, Daniel Eggleston, within the context of a family disagreement over the practical and legal aspects of Mrs. Potts' care.  Mr. Michitti's hunger strike comment is a direct reference to this family disagreement. Mr. Michitti also could only have learned about the situation from someone within the Department." *Id.*

Plaintiff briefly left the firehouse to pick up another officer, and upon his return sought out Captain Daniel Vail to "vent" about his conversation with Michitti.  Several other officers overheard Plaintiff venting to Cpt. Vail.  *Id.* at 012-13 & 106.  Following Plaintiff's interaction with Cpt. Vail, multiple officers filed Inter-Department Correspondence ("IDC Reports") with Chief Eggleston regarding their observations of Plaintiff's interaction with Vail.  Lieutenant Jeffrey Allen reported that he heard Plaintiff talking very loudly, that he used the word "Fuck" or "Fucking" several times, that he said "I am a fucking lieutenant. He can't say that to me!" and "I have combat experience.  I will have no problem drawing down on him." *Id.* at 99.  Lt. Allen concluded that "[m]y feeling is Lieutenant Potts was making threats to harm another employee with a gun and was very vocal about his intentions. He said this directly to Captain Vail and was overheard by myself, Assistant Chief Santoni, and Firefighter DeVaughn Bryant whom was sitting next to me in the report room." *Id.*  In his IDC Report, Asst. Chief Santoni confirmed that he overheard Plaintiff state "I am a fucking Lt. and he can't talk to me that way, followed by I have combat experience and I have no problem drawing down on him." *Id.* at 97.  Officer Bryant's IDC Report similarly confirmed that he overheard Plaintiff say "that he 'is a lieutenant and won't be spoken to otherwise'" and that Plaintiff stated he was "'combat trained,'" "owns a gun, and will 'stand him down'" in reference to Michitti. *Id.* at 98.  Likewise, Cpt. Vail's IDC

Report indicates that Plaintiff "raised his voice" "mentioned his military experience and how he was able to take things to another level if needed to deal with a problem." *Id.* at 96. Plaintiff also filed an IDC report that day in which he "apologized for his 'unintended indiscretion' when speaking with Captain Vail." *Id.* at 13.

On December 27, 2018, Director Keppler wrote to Plaintiff informing him that "[w]e are mandating that you seek psychiatric evaluation due to the incident in which you threatened your co-worker on Sunday, December 23, 2018" and that the City would continue its investigation and advise Plaintiff regarding his return to work in the near future. *Id.* at 105; *see id.* at 13.  On December 28, 2018, after Director Keppler had met with Plaintiff, she filed a report with the City of Binghamton Police Department concerning "a personnel complaint of where a Binghamton Fire Lieutenant had possibly made threats towards other employee on Sunday December 23, 2018."  *Id.* at 248.  According to the Police Report prepared by Investigator G. Laskowsky, Keppler reported, *inter alia*, that Plaintiff was involved in an incident on December 23, 2018 and that "other employees were making accusations that threats with guns were made." *Id.* at 248.  According to Inv. Laskowsky, Director Keppler further stated that on December 28, 2018, when she asked Plaintiff to explain what he meant by the phrase "Standing down," Plaintiff "extended one of his arms straight out and made a gun with his pointer finger and thumb," after which Director Keppler relieved Plaintiff of his duty and told him not to return until the City's investigation was completed. *Id.*  Plaintiff denied this course of conduct to Inv. Laskowsky. *Id.*  Nevertheless, at the request of Inv. Laskowsky, Plaintiff voluntarily surrendered his firearms to the Police Department.  *Id.* at 248-250.  On January 18, 2019, by Order of the

14

Broome County Court, Hon. Joseph F. Cawley, Plaintiff's full carry permit was suspended "based upon information relayed to the Court raising concerns that Mr. Potts had demonstrated a disregard for the safety and well-being of himself and/or others." *Id.* at 252.

On January 4, 11, and 16, 2019, Plaintiff was evaluated by psychologist William H. Connor, Ph.D. ("Dr. Connor"). *Id.* at 144. Dr. Connor employed, among other tests, the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"), which is "used to screen for serious psychopathology, anxiety, depression, thought disorder, and personality." *Id.* In a report authored on January 17, 2019, Dr. Connor concluded that Plaintiff's MMPI-2 scores "do not suggest serious psychopathology (serious mental illness, thought disorder, paranoia)" and that Plaintiff "denied anxiety and depression." *Id.* at 147. However, Dr. Connor "recommended that Lt. Potts be mandated to receive treatment for the trauma he received in combat in Iraq, and the adjustment he needs to make to civilian life." *Id.* at 147. On February 6, 2019, Dr. Connor informed Director Keppler of his recommendation, including that Plaintiff "have a first session with a trauma specialist prior to return to duty." *Id.* at 152.

On March 19, 2019, with the assistance of his attorney, Philip J. Artz, Esq., Plaintiff entered into an Agreement in Lieu of Discipline ("AILOD") with the City. *Id.* at 172-174. As part of the AILOD, Plaintiff acknowledged that under the City's Workplace Violence Policy, "the City as well as Supervisors are under an affirmative obligation 'to take appropriate steps, if any, to eliminate the potential for workplace violence." *Id.* at 173. He also acknowledged that it was "uncontroverted" that on December 23, 2018, he made the

15

statements "I have combat experience" and "I will have no problem drawing down on him" in the firehouse, and that those statements "triggered the City-Employer's duty to assess and evaluate whether he was a threat to the safety of the workplace environment." *Id.* Plaintiff further acknowledged that his attempts to explain his behavior were inadequate and that "the City-Employer has thoroughly investigated the incident, found that any fear for co-worker safety was reasonable, and thus required Lt. Potts to undergo a psychological evaluation by an independent medical examiner[.]" *Id.*  Pursuant to the AILOD, Plaintiff agreed that prior to returning to work he would, *inter alia*, be cleared for full duty by a trauma specialist and "attend a mandatory meeting with Chief Eggleston and [Director Keppler] to ensure [his] understanding as to why his previous statements were deemed to be threats to co-worker(s), unacceptable, a violation of policy, and unbecoming of a Lieutenant[.]" *Id.* at 173-74.

As Defendant points out, the DHR Record indicates that as late as July 3, 2019, Plaintiff had failed to satisfy the conditions of the AILOD.  For example, although Plaintiff attended the mandatory meeting with Chief Eggleston and Director Keppler in order to acknowledge that he understood his actions during the December 23 Incident were improper (as required by the AILOD), he made "a series of statements, as well as gave [] a written submission, that cast serious doubt on whether [he] understood the City's policy at all, let alone why [his] statements were unacceptable in the work place." *Id.* at 238. Chief Eggleston stated in the July 3, 2019 letter to Plaintiff that "as a Lieutenant it is your duty to enforce City policy. Simply put, if you do not understand it, you cannot be returned to duty. Therefore, you failed to satisfy Paragraph 4 of the Agreement in order to return to

work." *Id.* The letter also indicates: "On June 3, 2019, the City extended you an opportunity for another meeting to give you [a] second (and last) chance to demonstrate your understanding of the City's workplace violence policy and meet the return to work conditions. To date, you have refused this opportunity." *Id.* Nevertheless, Chief Eggleston extended to Plaintiff the opportunity to meet with him and the City's Corporation Counsel on July 15, 2019 "to clarify the statements made in your written submissions (as well as the mandatory meeting)." *Id.* Ultimately, Plaintiff was cleared to return to duty on July 30, 2019. *Id.* at 240 & 241.

On October 23, 2019, based upon the application of Plaintiff (who was again represented by Philip J. Artz, Esq.), Judge Cawley restored Plaintiff's pistol permit without restriction. In rendering his decision, Judge Cawley made the following findings of fact:

> During [the December 23 Incident] Lt. Potts was heard using the word "fuck" several times, and also stating that he [Potts] was a lieutenant and that he [firefighter Michitti] "can't talk to me that way." Lt. Potts also stated: "I have combat experience, I will have no problem drawing down on him."

*Id.* at 253.

> As a result of the foregoing comments, which were considered, *inter alia*, to be threatening, Lt. Potts was suspended from his employment at the Binghamton Fire Department. Concerned that he posed a potential danger to himself or others this Court also suspended his pistol permit.

*Id.* at 254.

> There was very little disagreement over the actual tone and content of the comments made by Lt. Potts in response to Firefighter Michitti's initial comments on December 23, 20[18]. The response by the City to those comments was, in this Court's opinion, entirely reasonable to ensure the safety of all employees.

*Id.* at 256.

In response to Defendant's presentation of this information, Plaintiff asserts that the DHR Record submitted by Defendant is not complete because if does not include Plaintiff's 333 page Rebuttal with Exhibits that Plaintiff filed in the DHR responding to the Respondents' Answer.  *See* Dkt. Nos. 65, 65-1, 65-2, 65-4, 65-5.  Plaintiff contends that his Rebuttal with Exhibits establishes that the City of Binghamton's initial determination that Plaintiff threatened to harm one of his co-workers with a gun was later overturned or deemed unfounded and that he subsequently was cleared to return to duty and recovered his firearm permit. Pl.'s Am. Opp'n, Dkt. No. 68, at p. 1-2 & 7.   Defendant responds:

> Plaintiff's argument, even if true, is completely irrelevant. The issue here is not whether, with the benefit of  hindsight and multiple rounds of psychological treatment, that Plaintiff was ultimately deemed fit for work; the issue is whether the damages Plaintiff now seeks to recover from Defendant are actually the direct and proximate consequence of the City of Binghamton's *initial* belief that Plaintiff had threatened to harm a fellow firefighter with a gun. The fact that the City of Binghamton did believe this to be true, that their conclusion on this point was "reasonable" at the time and that the subsequent consequences thereof encompass all of Plaintiff's damages, is not only undisputed, it is incontrovertible.

Dkt. 69, at 2-3 (emphasis in original).  Further, Defendant points out that Plaintiff's Rebuttal with Exhibits does not controvert the fact that he acknowledged in the AILOD (that he negotiated with the assistance of counsel) that it was reasonable for his fellow firefighters and the City to believe that the statements he made during the December 23 Incident were threats of violence and that the City's response to those threats was reasonable at the time.  Moreover, Defendant argues, some of the information presented by Plaintiff serves to support the City's initial determination.  For example, Plaintiff attaches a copy of the August 16, 2019 Hearing Transcript from his firearm permit hearing before the County Court wherein he gave sworn testimony.  During his testimony Plaintiff

admitted that he used the words "combat experience" and "drawing down" during the December 23 Incident. Dkt. No. 65-4 at CM/ECF pp. 39-40.  Further, in response to an inquiry from Judge Cawley as to whether "it [was] reasonable for those people to interpret what you said as a threat even if you didn't mean it as such? Would you agree with that?" Plaintiff testified "Yes." *Id.* at CM/ECF p. 71.

### Analysis

The issue here is not whether the City was justified in suspending Plaintiff and taking other actions in connection with the December 23 Incident, but whether Plaintiff has established by a preponderance of the evidence that the damages caused by Defendant's November 14, 2018 email are sufficient to bring this case within the $75,000 threshold of Section 1332(a).  Based on a review of the information submitted, the Court agrees with Defendant insofar as he contends that the record reflects that Plaintiff's suspension from work, the requirement that he undergo psychological evaluation and treatment, and the loss of his firearm permit were the results of the City's initial belief - whether right or wrong - that Plaintiff had threatened to harm a fellow firefighter with a gun. Thus, in this sense, a jury could conclude that Plaintiff's alleged damages arising from these actions were caused by his own conduct on December 23, 2018, and not by the November Email from Defendant.

Plaintiff argues, however, that "Defendant has a direct causal connection to everything that happened on December 23, 2018 and cannot now argue that he was not the proximate cause of the Plaintiff's defamation injury, having set the entire train wreck in motion by his email." Dkt. No. 68 at 10.  Plaintiff further contends: "It wasn't that Plaintiff's

behavior caused all of his problems - it was the Defendant's email to Plaintiff's employer which caused the expectation that the Plaintiff would become violent, and also caused the inappropriate comment which lead Plaintiff to make some animated statements to a ranking officer about it." *Id.* at 7.  Plaintiff also argues that damages are presumed under his defamation *per se* theory asserted in the SAC, and that the value of those damages must be determined by a jury. *Id.* at 11.

In light of the evidence presented through the DHR proceeding,[5] it is questionable whether a jury would award Plaintiff significant damages against Defendant for the actual damages that Plaintiff sustained from the City's handling of Plaintiff's December 23, 2018 conduct.  That being said, however, it is not legally impossible for Plaintiff to recover some damages against Defendant for his role in maligning Plaintiff's character and potentially increasing the severity the City's reaction to Plaintiff's conduct on December 23, 2018. Indeed, the November email indicates that Plaintiff's brother believes Plaintiff is "sociopathic and a liability" to the City, and contains a warning that "it is only a matter of time before he snaps and goes on a violent rampage."  A jury could conclude that Plaintiff's conduct on December 23, 2019, in insolation, did not warrant the severity of the discipline imposed but that Defendant's November Email, which raised a concern that

---

[5]This includes that Plaintiff admitted in Broome County Court that he made the statement attributed to him on December 23, 2018 and, when asked by Judge Cawley, conceded that it was reasonable for people to interpret his statements as a threat to harm a fellow firefighter with a gun; that he acknowledged in the AILOD that the City had thoroughly investigated the incident, and found that any fear for coworker safety was reasonable thus requiring Plaintiff to undergo a psychological evaluation by an independent medical examiner; that he agreed in the AILOD that prior to returning to work he would be cleared for full duty by a trauma specialist and attend a mandatory meeting with Chief Eggleston and Director Keppler to ensure his understanding as to why his previous statements were deemed to be threats to coworkers in violation of the City's Workplace Violence Policy; that Director Keppler instigated the police investigation that caused Plaintiff's firearm permit to be temporarily revoked; and that Plaintiff appears to have delayed his reinstatement because he did not want to acknowledge that his conduct on December 23, 2018 was threatening.

Plaintiff was "sociopathic" and was prone to going on a "violent rampage," influenced the severity of the discipline imposed.

Further, statements that "tend to injure another in his or her trade, business or profession," as do the statements in the November Email, constitute defamation *per se.* *Matthews v. Malkus*, 377 F. Supp.2d 350, 357 (S.D.N.Y. 2005)(citing *Liberman v. Gelstein*, 605 N.E.2d 344, 347-48 (N.Y.1992)).  When a statement rises to the level of defamation *per se*, injury is assumed.  *Mapinfo Corp. v. Spatial Re-Eng'g Consultants*, No. 02-CV-1008 DRH, 2006 WL 2811816, at *14 (N.D.N.Y. Sept. 28, 2006)(citing *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 179 (2d Cir. 2000)).  Although "actual damages must still be proven," *id.* (citing *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002), in turn citing *Orlowski v. Koroleski*, 234 A.D.2d 436 (2d Dep't 1996)), "'[e]ven where the plaintiff can show no actual damages at all, a plaintiff who has otherwise shown defamation may recover at least nominal damages.'" *Id.* (quoting *Celle*, 209 F.3d at 179, in turn quoting *Van-Go Transport Co. v. New York City Bd. of Educ.*, 971 F. Supp. 90, 100 (E.D.N.Y.1997)).   Although the courts look skeptically upon claims of punitive damages where jurisdiction is predicated only on their recovery, *see* *Nwanza v Time, Inc.*, 125 Fed Appx 346, 349 (2d Cir 2005) ("We will not allow a plaintiff to meet the amount-in-controversy requirement by demanding $5,000,000 in punitive damages, when the only actual damages that he claims are unavailable as a matter of law"), it is not a forgone conclusion that Plaintiff could not prove actual damages here.

In light of Plaintiff's seeming responsibility for the City's response to his conduct on December 23, 2018, a jury may not award damages coming close to $3 million plus figure

that Plaintiff seeks in the SAC.   Although it is close call, the Court finds that Defendant

has not rebutted the presumption that the face of the SAC is a good faith representation of

the actual amount in controversy by demonstrating that the SAC is so patently deficient as

to reflect to a legal certainty that Plaintiff could not recover the amount alleged, or that the

damages alleged were feigned to satisfy the jurisdictional minimum.  In the end, Plaintiff

has, at this time, sustained his burden of establishing by a preponderance of the evidence

that diversity jurisdiction exists.

### b.  Rule 12(b)(6)

The Court moves on to that aspect of Defendant's motion brought pursuant to Rule

12(b)(6) contending that the tortious interference with contractual relations and the

intentional infliction of emotional distress claims must be dismissed.

### Tortious Interference with Contractual Relations

Defendant argues that Plaintiff's tortious interference with contract claim is

duplicative of his defamation claim in that they both seek economic damages as a result of

Defendant's November Email. Dkt. No. 60-6 at 11 (*comparing* SAC at ¶ 43 *with id.* at ¶

50).  Plaintiff counters that the two claims are not duplicative because the tortious

interference with contract claim "is based upon all of the Defendant's known malicious

emails to Plaintiff's employer, including the truthful statements, not just upon the false

statements within the Nov. 14, 2018 email upon which the defamation claim is based."

Dkt. No. 68, at 12-13.  Plaintiff points to statements "made by Defendant in his January

and September, 2018 emails to the City" and contends that these statements, even

though they were ignored by the employer, "doesn't prove that those prior emails are not

22

going to have any negative impact upon Plaintiff's future promotion potential." *Id.* at 13. Plaintiff seems to contend that the combination of the Prior Emails and the November Email will negatively impact Plaintiff's potential to be promoted to the position of Captain. *Id.*

To establish a tortious interference with contractual relations claim, a Plaintiff must plead and prove four elements: "(1) [the plaintiff] had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Pasqualini v. MortgageIT, Inc.*, 498 F. Supp. 2d 659, 669–70 (S.D.N.Y. 2007). "'New York Courts have consistently ruled that a claim which is ostensibly based upon the intentional torts of interference with advantageous or contractual relations, but which alleges injury to reputation, is a disguised defamation claim and subject to a one-year limitations period under CPLR 215(3)." *Id.* at 670 (quoting *Pedraglio Loli v. Citibank, Inc.*, No. 97 Civ. 2179, 1997 WL 778750, *4, 1997 U.S. Dist. LEXIS 20070, at *10 (S.D.N.Y. Dec. 18, 1997)). Additionally, the courts have recognized that a tortious interference claim seeking economic damages derived entirely from defamatory statements is properly dismissed as duplicative of a defamation claim. *Goldman v. Barrett*, 733 F. App'x 568, 570-71 (2d Cir. 2018)(citing, *inter alia*, *Krepps v. Reiner*, 588 F. Supp.2d 471, 485 (S.D.N.Y. 2008) ("[A] [p]laintiff is not permitted to dress up a defamation claim as a claim for intentional interference with a prospective economic advantage."); *Pasqualini*, 498 F. Supp.2d at 669-70).

Defendant's motion in this regard is granted.  First, Plaintiff fails to provide a basis

to plausibly conclude that the Prior Emails could impact Plaintiff's future promotional opportunities.  Second, the tortious interference with contract claim and the defamation claim both seek damages for loss of promotional opportunities as "a direct and proximate cause of" Defendant's November 14, 2018 email.  *See* SAC ¶ 43 ("Defendant's November 14, 2018 email was a direct and proximate cause of: . . . Plaintiff's loss of opportunity for promotions and career advancement with his employer."); *id.* ¶ 50 ("Defendant's November 14, 2018 email was a direct and proximate cause of economic and compensatory damages, as well as special harm to Plaintiff, including but not limited to . . . loss of opportunity for promotions and career advancement opportunities.").  Because the tortious interference claim in the SAC, as pled, seeks economic damages derived entirely from the defamatory statements in the November Email, the claim is dismissed as duplicative of the defamation claim. *See Goldman,* 733 F. App'x at 571.

### Intentional Infliction of Emotional Distress

Defendant argues that the intentional infliction of emotional distress claim must be dismissed because it is duplicative of the defamation claim, and, even if not entirely duplicative, fails to state a claim upon which relief can be granted. *See* Dkt. No. 60-6 at 12-13.  Plaintiff counters that the claim contains sufficient factual allegations to support a intentional infliction of emotional distress claim, but he does not address whether the claim is duplicative of the defamation claim. *See* Dkt. 68 at 14-15.

Defendant's motion in this respect is granted.  "Under New York law, to state a claim for intentional infliction of emotional distress, a plaintiff must plead '(1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and injury, and (4) severe emotional distress.'" *Burroughs v. Mitchell*,

325 F. Supp. 3d 249, 285 (N.D.N.Y. 2018)(quoting *Bender v. City of N.Y.*, 78 F.3d 787, 790 (2d Cir. 1996)); *see Howell v. New York Post Co., Inc.*, 81 N.Y.2d 115, 121 (NY 1993)(same). "'Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Howell*, 81 N.Y.2d at 122 (quoting *Murphy v American Home Prods. Corp.*, 58 N.Y.2d 293, 303 (NY 1983)).  Even viewing the facts in the light most favorable to Plaintiff, nothing Defendant stated in the November Email arose to the level of conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency as to be regarded as atrocious and utterly intolerable in a civilized community. *See Carlson v. Geneva City Sch. Dist.*, 679 F. Supp. 2d 355, 372–73 (W.D.N.Y. 2010)("Defamatory statements are generally not sufficiently extreme and outrageous to support an [intentional infliction of emotional distress] claim" including "false accusations of criminal conduct.").

Furthermore, "an intentional infliction of emotional distress claim 'may be invoked only as a last resort to provide relief in those circumstances where traditional theories of recovery do not.'" *Pardovani v. Crown Bldg. Maint. Co.*, No. 15-CV-9065 (JPO), 2020 WL 2555280, at *10 (S.D.N.Y. May 20, 2020)(quoting *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (internal quotation marks and citations omitted)).  "As a result, New York courts have held that intentional infliction of emotional distress claims cannot 'be brought where the challenged conduct falls well within the ambit of other traditional tort liability.'" *Id.* (quoting *Salmon*, 802 F.3d at 256 (internal quotation marks and citation omitted)). Thus, where a plaintiff's intentional infliction of emotional distress claim is "fully encompassed by his defamation claim," this obviates "the need for him to proceed on an intentional infliction

of emotional distress theory." *Id.*   In Plaintiff's intentional infliction of emotional distress

claim, he alleges that "[a]s a direct and proximate result of the Nov. 14, 2018 email sent by

Defendant to Plaintiff's employer, Plaintiff has suffered personal injuries and bodily injuries

arising from the additional stress caused by the prospect of losing his job, and the reality

of having lost all future career advancement potential within the City of Binghamton Fire

Department."  SAC ¶ 60.  He seeks these same damages for the same conduct in the

defamation claim. *See* SAC ¶ 50.[6]  Plaintiff's intentional infliction of emotional distress

claim is dismissed because it fails to state a claim upon which relief can granted, and,

even it did state such a claim, it is duplicative of the defamation claim.

## IV.     CONCLUSION

For the reasons state above, Defendant's motion to dismiss, Dkt. No. 60,

**GRANTED in part and DENIED in part**.  That aspect of Defendant's motion challenging

whether Plaintiff asserts a basis for diversity jurisdiction is **DENIED**, and the motion is

**GRANTED** to the extent that the tortious interference with contractual relations and the

intentional infliction of emotional distress claims are **DISMISSED**.

**IT IS SO ORDERED.**

Dated: September 27, 2021

Thomas J. McAvoy
Senior, U.S. District Judge

---

[6]("Defendant's November 14, 2018 email was a direct and proximate cause of economic and compensatory damages, as well as special harm to Plaintiff, including but not limited to . . . the loss of all accumulated sick time available for future use, . . ., Plaintiff's loss of his employment with the City of Binghamton if he is medically required to take sick leave which he no longer has available, Plaintiff's loss of all or part of his pension if he loses his job due to the need for medical care for which he no longer has sick leave, a significant change in Plaintiff's career trajectory within the City of Binghamton Fire Department, . . . and a loss of opportunity for promotions and career advancement opportunities, as well as the personal and bodily injuries arising from or exacerbated by the stress of having to fight to keep his job and recover his firearms.")

26